Upon review of the competent evidence of record, and finding no good grounds to receive further evidence or rehear the parties or their representatives, the Full Commission, upon reconsideration of the evidence, affirms the Opinion and Award of the Deputy Commissioner.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. The parties are subject to the North Carolina Workers Compensation Act.
2. An employee-employer relationship existed between plaintiff-employee and defendant-employer.
3. The carrier on the risk is American Insurance Company.
4. The parties stipulated into evidence as Stipulated Exhibit 1, a packet of exhibits including North Carolina Industrial Commission forms and plaintiffs medical records from Caldwell Family Physicians, Dr. Reid Zenter, Taylorsville Family Care, and Miller Orthopedic Clinic.
5. The parties stipulated into evidence as Stipulated Exhibit 2, a Form 22 Statement of Days worked and Earnings of Injured Employee.
6. The parties stipulated into evidence as Stipulated Exhibit 3, Plaintiffs Answers to Defendants First Set of Interrogatories and Request for Production of Documents.
7. The parties stipulated into evidence as Stipulated Exhibit 5, a wage printout of plaintiffs weekly income from 20 December 1999 through 25 February 2000.
 ***********
Based upon the competent evidence of record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. At the evidentiary hearing, plaintiff was thirty years old. She has a high school degree and an employment history as a leather sewer. Plaintiff became employed with defendant-employer in November 1997 as a production upholstery sewer of leather covers for chairs, sofas, loveseats, and ottomans. Plaintiff worked nine to ten hour workdays, up to 55 or 56 hours per week, sewing upholstery for twenty or more chairs per day, sixteen to seventeen loveseats per day, or ten to eleven sofas per day. Plaintiffs job involved constant and strenuous use of her hands and arms, repeatedly pulling and tugging on leather materials (which are heavier than fabric materials), elevation of the arms above the table without support, and reaching above shoulder level. During her employment with defendant-employer, plaintiff was a high volume producer and the highest paid production sewer.
2. Plaintiff did not have arm pain prior to her employment with defendant-employer. However, shortly after beginning work with defendant-employer, she developed arm pain which worsened progressively over the next year. On 11 May 1999 and 18 May 1999, plaintiff sought medical treatment from Reid Zenter, D.C., a chiropractor, and complained of right shoulder pain, neck pain, and numbness shooting to the hands on the right side. At that time, plaintiffs range of motion on the left shoulder was abnormal. Dr. Zenter thought plaintiff had a right rotator cuff problem. Dr. Zenter has treated many furniture sewers who have shoulder problems caused by pulling on fabric at their jobs.
3. Thereafter, plaintiff sought treatment with her family physician, Marc Guerra, M.D., who treated her from 29 September 1999 through 13 October 1999 for headaches, neck pain, shoulder pain, numbness, and tingling. Dr. Guerra suspected cervical discitis caused by plaintiffs sewing job.
4. Plaintiff reported Dr. Guerras diagnosis to defendant-employer. On 19 October 1999, plaintiff was sent to Family Care Center, the designated provider for defendant-employer, where she was seen by Jeffrey Katz, a physicians assistant. Plaintiff complained of pain in the area of her bra strap up to the bottom of her head and that she could not lie on either side at night. Mr. Katz prescribed a course of physical therapy, which was not helpful. On 22 November 1999, plaintiff returned to Mr. Katz on follow-up and indicated that she had returned to working full time duty at full capacity one week prior. Since returning to work, plaintiff had developed lower neck pain which radiated down her left shoulder and her left upper extremity to the ulnar and radial aspects of the left hand. Plaintiff also complained of burning knots in her shoulder and decreased grip strength when in pain. At that time, plaintiff was returned to light duty for ten days. Mr. Katz also recommended an MRI, which defendants refused to authorize. Mr. Katz often treats sewers who complain of arm pain from their job duties and at least fifty percent of these arm complaints are caused by or aggravated by the job duties of a sewer.
5. On 6 December 1999, plaintiff presented to Jerry L. Barron, M.D., a board-certified orthopedic surgeon, who concentrates on treatment of the shoulder and knee. At that time, plaintiff gave a history of a 1 to 1 ½ year period of shoulder pain, which had worsened over the last year. Plaintiff also described her job as an upholstery sewer. On that date, Dr. Barron diagnosed plaintiff with underlying multi-directional instability ligamentous laxity with secondary impingement and winging of her scapular related to a repetitive motion job. By 25 February 2000, plaintiff had not improved with physical therapy and medications and she thus underwent a surgical examination of the left shoulder with an electrothermal capsulorrhaphy and arthroscopic decompression. At the time of Dr. Barrons 10 May 2000 deposition, plaintiff was not at maximum medical improvement, but Dr. Barron was of the opinion that plaintiff would probably have permanent restrictions: she would be unable to return to repetitive work of any nature, would be required to avoid all overhead lifting and motion, would be allowed to lift no more than five to fifteen pounds occasionally, limited pushing and pulling, and no frequent lifting of any type. Dr. Barron was of the opinion that these restrictions should probably be on both plaintiffs arms, as the limitation of the left arm would cause increased use and overuse of the right arm resulting in the same condition.
6. Plaintiff was written out of work by Mr. Katz from 22 November 1999 through 6 December 1999. Plaintiff was kept out of work by Dr. Barron from 6 December 1999 through 19 December 1999. Thereafter, plaintiff returned to work for a few days but began having symptoms and was again written out of work by Dr. Barron from 24 February 2000 and continuing.
7. For the period from 20 December 1999 through 23 February 2000, plaintiff was placed on limited work hours by Dr. Barron and earned a reduced income. Plaintiff earned the following wages for the weeks ending as noted:
• 6 January 2000 — $665.03
• 13 January 2000 — $755.81
• 20 January 2000 — $962.30
• 27 January 2000 — $867.14
• 3 February 2000 — $924.29
• 10 February 2000 — $806.90
• 17 February 2000 — $782.61
8. After reviewing the stipulated videotape of plaintiffs job, Dr. Barron was of the opinion, and the Commission finds, that plaintiffs job substantially contributed to or aggravated the condition with which he diagnosed plaintiff. Dr. Barron was of the opinion, and the Commission finds, that, although plaintiffs multi-directional instability is congenital, any repetitive motion such as her employment activity as a sewer would aggravate the instability. The initial instability and the aggravation thereof caused pain which resulted in the impingement syndrome, which resulted in disuse and dysfunction of the scapular muscles, and the resulting winging. Dr. Barron was further of the opinion, and the Commission finds, that plaintiffs job as a sewer placed her at a higher risk of developing these conditions than members of the general population not similarly employed.
9. North Carolina Vocational Rehabilitation is sponsoring plaintiffs full-time schooling at Caldwell Community College for a two to four year degree in the healthcare field. Plaintiff has been cooperative with these efforts. She is attending full time school in lieu of a job search, which is a reasonable given her pre-injury wage, education, and likelihood of obtaining suitable employment without training for a new career.
10. Plaintiff did not become aware that her shoulder pain was caused by her employment until so informed by Dr. Guerra in the 29 September 1999 to 13 October 1999 timeframe. Plaintiff almost immediately thereafter informed her employer and sought medical treatment.
11. On or about 29 September 1999, plaintiff contracted the compensable occupational diseases of aggravated multi-directional instability, ligamentous laxity, impingement syndrome, and winging of the scapular.
12. As a direct and proximate result of her compensable occupational diseases, plaintiff was unable to engage in physical activities required by her former job or any other job from 22 November 1999 through 19 December 1999 and from 24 February 2000 and continuing.
13. From 22 November 1999 through 19 December 1999 and from 24 February 2000 and continuing, plaintiff has been incapable of earning the same wages which she was earning at the time she contracted her compensable occupational diseases.
14. As a direct and proximate result of her compensable occupational diseases, plaintiff was unable to engage in physical activities required by her former job, was incapable of earning the same wages which she was earning at the time she contracted her occupational disease, and earned a diminished wage from 20 December 1999 through 23 February 2000. During this time (9.3 weeks) plaintiff earned a total of $5,764.08.
15. Plaintiffs average weekly wage at the time of the contraction of her occupational diseases was $966.59.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiffs aggravated multi-directional instability ligamentous laxity with impingement syndrome and winging of the scapular were proximately caused, aggravated, and accelerated by causes and conditions characteristic of and peculiar to plaintiffs employment with defendant-employer, but excluding all ordinary diseases of life to which the general public is not equally exposed. G.S. 97-53(13); Booker v. DukeMedical Center, 297 N.C. 458, 256 S.E.2d 189 (1979).
2. At the time she developed her occupational diseases, plaintiff earned an average weekly wage of $966.59, yielding the maximum compensation rate for 1999, $560.00. G.S. 97-2(5).
3. Plaintiff is entitled to temporary total disability compensation at the rate of $560.00 per week for the period from 22 November 1999 through 19 December 1999 and from 24 February 2000 and continuing. G.S. 97-29.
4. Plaintiff is entitled to temporary partial disability compensation due to her diminished earning capacity at a rate of $231.21 per week from 20 December 1999 through 23 February 2000. G.S. 97-30.
5. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff as a result of her compensable occupational diseases. G.S. 97-59.
6. Given her age, education, physical restrictions due to her compensable injury, and likelihood of otherwise obtaining suitable employment, plaintiffs decision to attend school and be trained for a new career is not grounds for a suspension of benefits. G.S. 97-32.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay temporary total disability compensation to plaintiff at the rate of $560.00 per week from 22 November 1999 through 19 December 1999 and from 24 February 2000 and continuing until further order of the Commission. Subject to the attorneys fee contained in Paragraph 3, any accrued amount shall be paid in a lump sum to plaintiff.
2. Defendants shall pay temporary partial disability compensation to plaintiff at the rate of $231.21 per week from 20 December 1999 through February 2000. This amount has accrued and shall be paid in a lump sum, subject to an attorneys fee contained in Paragraph 3.
3. A reasonable attorneys fee of twenty-five percent of the compensation due under Paragraphs 1 and 2 of this Award is approved for plaintiffs counsel and shall be paid as follows: twenty-five percent of the accrued amount due plaintiff shall be deducted and paid directly to plaintiffs counsel. Thereafter, plaintiffs counsel shall receive every fourth compensation check.
4. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff as a result of her occupational diseases.
5. Defendants shall pay the costs.
 S/______________ RENE C. RIGGSBEE COMMISSIONER
CONCURRING:
 S/_______________ LAURA K. MAVRETIC COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER